OB7RMASo

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          23 Cr. 347 (JGK)

5    ALEXANDER MASHINSKY,

6                                          Oral Argument
               Defendant.
7
     ------------------------------x
8
                                          New York, N.Y.
9                                         November 7, 2024
                                          2:30 p.m.
10

11   Before:

12                  HON. JOHN G. KOELTL,

13                                         District Judge

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  PETER DAVIS
17        ADAM SLOAN HOBSON
          Assistant United States Attorneys
18
     MUKASEY YOUNG LLP
19        Attorneys for Defendant
     BY:  MARC LEE MUKASEY
20        TORREY K. YOUNG
          MICHAEL F. WESTFAL
21

22

23

24

25

OB7RMASo

1          THE COURT:  Good afternoon, all.  Please be seated.

2          MR. DAVIS:  Good afternoon, your Honor.  Peter Davis

3    and Adam Hobson for the government.

4          MR. MUKASEY:  Good afternoon, Judge Koeltl.  Marc

5    Mukasey for the defendant Alex Mashinsky, who is seated to my

6    left.  With me, and we may hear from today, my colleagues

7    Torrey Young and Michael Westfal.

8          THE COURT:  Good afternoon, all.  There are two

9    applications pending before the Court.  The first is the motion

10   to dismiss and also to strike the bankruptcy allegation from

11   the indictment.  I'm familiar with the papers; perfectly

12   prepared to listen to the parties for anything that they would

13   like to tell me on that motion.

14         MS. YOUNG:  Thank you, your Honor.  I'll begin briefly

15   with the request for Count Two, the commodities fraud count, to

16   be dismissed as repugnant and inconsistent with Count One, the

17   securities fraud count.

18         Count One, in sum, charges securities fraud based on

19   allegations that Mr. Mashinsky made false and misleading

20   statements to induce investors to purchase an interest in

21   Celsius's Earn program with their crypto assets.  Count Two, in

22   sum, charges commodities fraud based on allegations that

23   Mr. Mashinsky made false and misleading statements to induce

24   investors to sell their Bitcoin in exchange for an interest in

25   Celsius' Earn program.  So count One securities, induced

OB7RMASo

1    investors to purchase; Count Two, commodities, induced

2    investors to sell their Bitcoin for an interest.

3           So the government is charging as both securities fraud

4    and commodities fraud the exact same interests in Celsius's

5    Earn program.  The same contracts --

6           THE COURT:  Is that right?  I mean, the security

7    interest is the account.  The commodity is the specific CEL

8    that's within the account.  Why does that make the two counts

9    inconsistent?  And the fact that one part of the transaction

10   involving the account is charged under the securities laws, and

11   the specific asset is charged under the commodities laws

12   doesn't make them inconsistent.

13          Is there any case which has found that under any sort

14   of similar circumstances a charge under securities laws is

15   inconsistent with a charge under the commodities laws?

16          MS. YOUNG:  Well, your Honor, I'll start with that

17   last question, which is that we've yet to identify a single

18   case where securities fraud and commodities fraud have been

19   charged for the exact same program such as here.  And there is,

20   however, significant precedent under the securities law context

21   that the totality of the circumstances are to be taken.

22          And when defendants tried to break apart the overall

23   transaction and point only to the asset, the token, courts have

24   consistently said that that cannot be done, but that's exactly

25   what the government is doing here by charging it that way,

OB7RMASo

which is breaking apart the entire alleged securities

transaction and pulling out the token as a commodities fraud.

And you can look at paragraph 12 of the indictment

which kind of illuminates why this becomes irreconcilable.

That paragraph and I'll quote says, "Celsius's primary public

offering was its Earn program through which Celsius offered a

platform for customers to provide their cryptocurrency assets

to Celsius, to invest in exchange for providing their crypto

assets including Bitcoin to Celsius customers."  So here with a

reference to Bitcoin, it's saying that those crypto assets are

being provided.  But in Count Two, suddenly that same Bitcoin,

which is otherwise alleged in the facts as being provided is

being alleged as being sold.  So I'm going to give, perhaps, an

example of how this might play out.

THE COURT:  But why is that inconsistent?  The

investment program for the investment is the account, and the

Bitcoin, which is one of the deposits in the account or one of

the earnings for the account, is alleged to be the commodity,

and the fraud with respect to the Bitcoin, or the scheme with

respect to the Bitcoin, is the false statements in connection

with the sale of that Bitcoin.

MS. YOUNG:  But to look at the facts as alleged for

the securities count, for Count One, you have to view the

entirety of the program, the Earn program.  So if a customer

were to use Bitcoin to gain an interest in the Earn program,

OB7RMASo

1    the customer would somehow simultaneously be depositing the

2    Bitcoin for an interest in the Celsius Earn program for

3    purposes of Count One, but then also simultaneously

4    irreconcilably be selling.  And I'm going to highlight the word

5    sale because that's what is required under the commodities

6    statute.

7              THE COURT:  Why does it have to be simultaneous?

8              MS. YOUNG:  Well, there are no facts alleged to

9    suggest that there are types of transactions when a customer

10    provides or transfers their crypto asset for purposes of the

11    Earn program.

12              THE COURT:  The Earn program is a way of earning CEL

13    in the program.  What happens to the CEL when it's in the

14    account is another issue.  Are people misled into keeping the

15    CEL or selling the CEL?

16              MR. MUKASEY:  Judge, I apologize for interrupting.

17    For purposes of the record, because this is going to get

18    confusing --

19              THE COURT:  Oh, CEL.

20              MR. MUKASEY:  -- we should distinguish between sell

21    and CEL.  S-E-L-L is the act of selling.  C-E-L is the name of

22    a token that can be sold.  Thank you, Judge.

23              MS. YOUNG:  Your Honor, there are no facts in

24    paragraph 1 through 71 that even amount to a sale.

25              THE COURT:  But there's no allegation in the motion

OB7RMASo

1    that there are insufficient facts alleged or that the Count

2    should be dismissed because it's vague; putting aside the other

3    allegation of sales on the market, market transactions.  There

4    are plenty of facts alleged in the indictment, and the

5    indictment tracks the words of the statute, which according to

6    the cases is sufficient to state the crime.  You say, well,

7    there are insufficient facts alleged as to how these

8    transactions were conducted.  Well, isn't that a question for

9    trial?

10              MS. YOUNG:  No, your Honor.  The argument is that

11    there are no facts that support a sale, and there are none

12    alleged.  And while the government's fallback is the indictment

13    tracks the statutory language, that does not save the count.  I

14    mean, we cite cases like *Rajaratnam* and *Heicklen* and *Aleynikov*

15    where the charge tracked the statute, and yet it was considered

16    irreconcilable, inconsistent, and repugnant and therefore

17    dismissed.

18              THE COURT:  Because in those cases, if you found guilt

19    with respect to one count, it was inconsistent with finding

20    guilt with respect to the other count.

21              MS. YOUNG:  And that would be the same here because

22    for securities law purposes, it would be inconsistent to take

23    the whole and then also break it into the parts.

24              THE COURT:  Why?

25              MS. YOUNG:  Because the securities laws have said that

OB7RMASo

1    the entire Earn program is not to be viewed -- or any Earn

2    program or transaction is not be viewed as a --

3            THE COURT:  So you have to look at the whole

4    transaction to find out if it's an investment contract, right?

5    I mean, you can correct me if I'm wrong, but there's no case

6    that says that part of an investment contract cannot be a

7    commodity, which, if in some way it's part of a commodities

8    fraud, it can't be separately charged.

9            There's no case that says that, and there's no case

10   that says you can't have both a Securities Act violation and a

11   Commodities Act violation in separate counts.  Fair?

12           MS. YOUNG:  There are not -- we have not identified a

13   case that prohibits this, but there are also no facts to

14   support Count Two.  Which I do think we argued in our papers

15   that it is inconsistent with paragraphs 1 through 71 in a

16   reading of the indictment to then allege sale, when Count Two

17   incorporates paragraphs 1 through 71 which repeatedly refer to

18   the investment, transfer, you know, purchase.  So to suddenly

19   insert sale would be inconsistent with a reading of the rest of

20   the indictment and a potential conviction under Count One.

21           THE COURT:  Okay.

22           MS. YOUNG:  Thank you.

23           THE COURT:  Go ahead.  Anything else on the motion to

24   dismiss?

25           MS. YOUNG:  I'm going to turn it to Mr. Westfal for

OB7RMASo

1    the other arguments.

2              THE COURT:  Okay.

3              MR. WESTFAL:  Good afternoon, your Honor.

4              THE COURT:  Good afternoon.

5              MR. WESTFAL:  Your Honor, Count Six charges

6    Mr. Mashinsky with market manipulation under Section 9(a)(2) of

7    the Exchange Act and we understand the government's

8    manipulation charge essentially to be as follows:  That

9    Mr. Mashinsky told customers that Celsius would go into the

10   market every week, and Celsius would only buy the amount of CEL

11   token that was needed for weekly rewards.  Nothing more, only

12   that amount.

13             In reality, the government alleges that for somewhere

14   between——I'm not sure——either a year and a half or four years,

15   Celsius bought more CEL token than was needed for weekly

16   rewards and that artificially inflated the price of CEL.  Now,

17   for purposes of today's argument, we'll set aside the fact that

18   Mr. Mashinsky never actually said those words, that we will

19   only buy the amount needed for weekly rewards.  The Court can

20   accept that as true for purposes of this motion, but it's

21   certainly animating the motion that we've brought.

22             And the question presented is whether that charge,

23   those allegations, Mr. Mashinsky received constitutionally

24   sufficient notice that the charge conduct was criminal under

25   Section 9(a)(2).  And I'll note that we would hope that the

OB7RMASo

1    Court doesn't view this motion as some sort of a broadside

2    against market manipulation as a crime in general.  There's

3    also a 10(b)(5) charge, and there's also a wire fraud charge

4    that we have not moved against.  This is a targeted motion

5    focused on the statute that we believe is far too broadly

6    worded and doesn't provide sufficient notice.

7        THE COURT:  You can correct me if I'm wrong, but the

8    gist of the motion is that this market manipulation charge

9    can't apply -- cannot, does not apply to transactions on the

10   open market.

11       MR. WESTFAL:  That's right.

12       THE COURT:  And there's no case that supports that

13   proposition.

14       MR. WESTFAL:  I think our motion, your Honor, is a

15   little bit -- slightly different.  It's certainly grounded in

16   the open-market nature of the transactions.  In some respects,

17   perhaps in all respects, wash trading, match orders, those are

18   open market as well.

19       What we're dealing with in this count, in this charge,

20   is an allegation that genuine transactions between one

21   counterparty and an unrelated counterparty.  There's no

22   collusion.  There's no match trading at market prices, right.

23   There's no allegation that the CEL token was bought at

24   artificially inflated prices but it was bought at the market

25   price.  And the charge, as we understand it based on the

OB7RMASo

1    indictment and the government's opposition, is that it is

2    criminal market manipulation for Celsius, and in this case

3    Mr. Mashinsky, to have directed open-market transactions with

4    genuine counterparties at the market price so long as those

5    transactions moved the price, and it was done with criminal

6    intent.

7              So the problem that we see with that charge, your

8    Honor, or that theory is we have case law from -- starting with

9    the Supreme Court in the *Crane Co*. case, which says that

10   Section 9(a)(2) does not condemn extensive buying or buying

11   which raises the price of a security in itself.  So open-market

12   transactions that move the price are lawful.

13             Several judges in this district, Judge Holwell, Judge

14   Mukasey, and Judge Sullivan, have also come to the conclusions

15   that securities transactions that move the price——that raise

16   the price, that lower the price, are not in and of themselves

17   criminal.  And I'll focus --

18             THE COURT:  But you can correct me if I'm wrong, but

19   there is no case, where if those transactions on the open

20   market are made with the requisite criminal intent, where a

21   judge in this district has said that doesn't fall within the

22   statute.  I mean, I'll go back and read those cases again, but

23   I thought that that was a given between parties, that there is

24   no case of another judge of this court saying that if you do

25   these things with the requisite criminal intent, that doesn't

OB7RMASo

1    fall within the statute.  So the claim can be dismissed as a

2    matter of law.  The government points to at least one other

3    case where they asserted the same theory, and your response

4    was, well, that was after this case.

5            MR. WESTFAL:  Yes.

6            THE COURT:  And this motion has been pending for a

7    little while.  You can tell me what happened with that case,

8    but the government has pursued that theory.  And it's plain

9    that simply because even if this were the first case to pursue

10   such a theory, that's not in and of itself a reason for

11   dismissal.

12           MR. WESTFAL:  I think we agree with that last part,

13   your Honor.  I think as to the first part of the question, we

14   also agree that in our research——and I think according to the

15   briefing in the Hwang case and the briefing from this case from

16   the government——that the Hwang indictment was the first time

17   that the government had pursued this market manipulation theory

18   in a criminal case under Section 9(a)(2).

19           So in terms of notice, my understanding is does the

20   language of the statute provide notice to Mr. Mashinsky --

21           THE COURT:  So the other cases which you had cited a

22   few minutes ago don't stand for the proposition that a charge

23   like this cannot be brought under the statute, right?

24           MR. WESTFAL:  So my response, your Honor, is that the

25   only case we're aware of that considered that issue -- the only

OB7RMASo

```
 1    criminal case we're aware of that considered that issue is the
 2    Hwang case.
 3            Our point in terms of fair notice/fair warning that
 4    this conduct charged in this way is criminal as opposed to a
 5    civil violation is that the only case that considered that
 6    issue was indicted after the conduct at issue.
 7            THE COURT:  I know.  I was just drawing a distinction
 8    between the couple of cases, which you have cited from
 9    colleagues a moment ago, couldn't stand for the proposition
10    that I thought you were citing them for which is that a charge
11    such as this can't be brought under the statute.  Those cases
12    couldn't have stood for that.
13            MR. WESTFAL:  And we're not citing them for that
14    purpose.  We're citing those cases to try to understand the
15    scope of what we view as an impermissibly broadly worded
16    statute.  We're trying to understand it.  And as we set forth
17    in our papers, and I won't go through in detail now, to
18    understand that statute, we start with the language.  And the
19    language itself says nothing about price manipulation.  It says
20    nothing about artificial prices, and it says nothing about
21    manipulative intent, which the government is pointing to as the
22    essential element that defines the difference between legal
23    conduct and criminal conduct.  It's not in the statute, and the
24    only criminal case that has applied it in this manner was
25    indicted after this case.  That's our fair notice point.
```

OB7RMASo

1              THE COURT:  What happened with Hwang?

2              MR. WESTFAL:  So Mr. Hwang filed a similar motion to

3      dismiss which Judge Hellerstein denied.  The case went to

4      trial, and I wish I were prepared today, your Honor.

5      Unfortunately, I'm not.  There was a fascinating moment that

6      Ms. Young and I just happened to be in the courtroom for in

7      which the government's cooperating witness was on the stand

8      describing the conduct at issue, and Judge Hellerstein

9      intervened started asking questions that I think everyone in

10     the courtroom understood to be trying to elicit helpful

11     testimony from the defendant.

12             I'll summarize from memory, and it's not perfectly

13     accurate.  The question was essentially:  Well, isn't it

14     possible that you were conducting securities transactions at an

15     early morning time in order to raise the price to attract new

16     buyers?

17             I mean, that almost to a tee describes the

18     government's market manipulation theory here, and to a tee

19     covers the elements of the statute.  And again, I think

20     everyone in the courtroom understood that to be eliciting

21     testimony helpful for the defense which, again, I view as a

22     problem with the statute.

23             I would also say -- and again, we can provide more

24     information, and actually, your Honor, this will come up

25     certainly in the context of the jury charge, certainly

OB7RMASo

depending on the outcome of this motion, but there will be

inevitably, and there wasn't in the Hwang case, a fight about

the, as I would describe, a single purpose test where there's

ample case law in this district that says that if you enter in

a securities transaction, in order for it to be criminal, you

can only do it for the sole purpose of manipulation.  And if

you have a legitimate investment or economic reason to also

enter into that transaction, it's by definition not criminal.

         Now, the government doesn't agree with those cases and

will cite different cases to you.  When that was put before

Judge Hellerstein, my read of the final instructions to the

jury in that case was that there was no decision on that

critical issue, and the Judge essentially said, Jury, that's

for you to decide.  Again, we view that as a problem that comes

from a statute that's overbroad, and that does not define the

difference between legal conduct and criminal conduct.

         THE COURT:  So Judge Hellerstein denied the motion to

dismiss?

         MR. WESTFAL:  That's right.

         THE COURT:  And the case went to the jury, and there

was what result?

         MR. WESTFAL:  There were, I think, convictions on all

counts.  I think there were nine, approximately nine, market

manipulation counts.  I think one for each of a different

security.  That case, as we understand it, there has not been

OB7RMASo

```
1    Rule 29 or Rule 33 briefing, and I don't know if it's going to

2    be appealed.  The defendant has not been sentenced yet, so it's

3    in post-trial proceedings.

4              THE COURT:  So the government can tell me.  They are

5    anxious to respond, and you'll have an opportunity shortly.

6    Was Judge Hellerstein's denial of the motion to dismiss, you

7    know, did that come down after the briefing on this motion?

8    This motion was briefed a while ago, I know.

9              MR. WESTFAL:  It did not.  We've cited it in our

10   papers, and the manner in which we cited it was to say the

11   government in that case and Judge Hellerstein -- I might be

12   wrong now that I'm saying it, but the point is Judge

13   Hellerstein relied on the same three private civil securities

14   lawsuits and SEC civil enforcement actions to approve of this

15   market manipulation theory.

16             THE COURT:  Okay.

17             MR. WESTFAL:  The last thing I would say on this, your

18   Honor, is I want to point out the language of the market

19   manipulation theory based on those three cases.  So the

20   government has said this is perfectly legitimate.

21   Mr. Mashinsky had notice.  See the *ATSI Communications* case

22   where the Second Circuit said in some cases scienter is the

23   only factor that distinguishes legitimate trading from improper

24   manipulation.  And in the *Set Capital* case, open market

25   transactions that are not inherently manipulative may
```

OB7RMASo

constitute manipulative activity——may——when accompanied by

manipulative intent.  So we have three cases that the

government has cited in that case and in this case that they

are using to ground their market manipulation theory, which is

that the only line——this is quoting from the Second

Circuit——between legitimate trading and improper manipulation,

the only factor is scienter; someone's state of mind.

          For that proposition, the reason that might be okay in

a private case, a private securities case, or an SEC case is

that those are civil.  As Judge Holwell said in the *SEC v.*

*Masri* case two things:  One, it is unusual in American law to

impose liability based solely on the intent of the actor, and

it is hornbook criminal law that one is not punished solely for

a criminal state of mind but only where one's action is

prohibited as well.

          What we view this market manipulation charge to be is:

You purchased CEL token.  It increased the price, and you did

it with the wrong state of mind.  The law says you can purchase

CEL token to increase the price as long as you don't have the

wrong state of mind.  For that to be the only factor that

differentiates between legal conduct and criminal conduct, we

view as a violation of the hornbook law principle described by

Judge Holwell.

          I've just been given a note.  If I could check one

point, your Honor, on our brief on the Judge Hellerstein

OB7RMASo

1    question?

2              THE COURT:  Relax.  The government will have an

3    opportunity to respond in just a moment.

4              MR. WESTFAL:  I believe this is what I had said, but

5    in our brief, we put in Judge Hellerstein's decision denying

6    the motion in Hwang citing to the cases I just mentioned, *Set*

7    *Capital* and *ATSI*.

8              THE COURT:  Okay.

9              MR. WESTFAL:  I think that's the theory of our motion,

10   and, again, we view it as impermissible to rely strictly on

11   civil SEC cases where the only distinguishing factor is what's

12   in someone's head.

13             THE COURT:  Okay.

14             MR. WESTFAL:  Thank you, your Honor.

15             THE COURT:  Thank you.

16             Government?

17             MR. DAVIS:  Thank you, your Honor.  I'd like to take

18   these two motions in turn, so starting first with a brief

19   response, if the Court would permit, on defendant's argument

20   about the commodities count and the securities count in Count

21   One.

22             So on that, Judge, I'd like to make three points.  The

23   first is about how the defendant has not identified any factual

24   inconsistency here between the two counts.  The second is how

25   defense has not identified any legal inconsistency here between

1    the two counts or the application of the *Howey* test.  And then

2    finally, I want to get to the point that the defense raised

3    about the sufficiency of the factual allegation about the sale.

4           So starting, your Honor, with the factual

5    inconsistency.  As this Court noted, there's no factual

6    inconsistency between Count One, which alleges that there are

7    lies in connection with the purchase of an interest in the Earn

8    program, and Count Two, which alleges that there will lies in

9    connection with the sale of Bitcoin to Celsius for an interest

10   in the Earn program.  As this Court notes, those are two

11   separate transactions that we've identified.

12          And when counsel says that we've charged the same

13   exact scheme twice, that's not right.  The second part as

14   alleged in the indictment, the sale of Bitcoin to Celsius, the

15   first part, is talking about the investment contract as a

16   whole.  And that's what takes us out of these cases which talk

17   about mutually inconsistent factual allegations; the

18   allegations that cannot be true together.

19          That brings us to point two, which is legal

20   inconsistency.  And the way counsel has framed this argument is

21   it says look at the *Howey* test.  The *Howey* says you can't break

22   down a transaction to its component parts, but the *Howey* they

23   test does not say what can or cannot be a commodity.  That is

24   misusing the *Howey* test.  And so, on this second point on

25   whether Bitcoin is a commodity, we hear no dispute that Bitcoin

OB7RMASo

1  is a commodity.

2         On the first point that the interest in the Earn

3  program constituted an investment program, we hear no dispute

4  that that could constitute an investment program.  Where we

5  disagree is these courts that defense has cited about applying

6  the *Howey* test, they do not say that they're being exclusive of

7  what could be a commodity under the CEA.  And to that point,

8  your Honor, I think this Court recognized in *Reed* that a

9  cryptocurrency could be itself both an investment contract and

10 also fall under the jurisdiction of the CEA.  And so, our view

11 is consistent with all those cases that Count One and Count Two

12 stand together.

13        Getting to this last point, as counsel says, counsel

14 noted other times in the indictment different verbs being used.

15 I would just cite to the Court that this was addressed in the

16 *Coburn* case where *Coburn* says in an indictment using different

17 verbs, the mere presence of different verbs in an indictment is

18 not a problem.  And what really counsel is saying is that there

19 aren't sufficient factual allegations to support that this is a

20 sale of Bitcoin, and that, as this Court has recognized, is a

21 question for the jury.  We have alleged it in the indictment.

22 That's all that is required at this stage.

23        So with that, your Honor, I would like to move onto

24 the market manipulation due process challenge that counsel has

25 made.  So for here, just to answer the Court's question

directly, this argument was rejected in *Hwang*, and the

defendant was convicted in that case.  Our understanding is

that there was an oral application for Rule 29.  That, too, was

denied, and it was rejected for good reason.  What the

defendant is arguing here is a due process challenge based on

vagueness, and we know how to answer that question.  We look at

the statute, and then we look at the decisional law to see

whether a reasonable person would be on notice here.

        And looking at the statute, the statute could not be

more plain in penalizing people for -- it talks about actual

and apparent trading in such security.  That's talking about

real trades.  And then, the decisional law, as this Court

recognized and as counsel conceded, the last decades of

decisional law in this space have made clear that this theory

of market manipulation is valid.  That's *Valley Management* in

2022.  That's *Set Capital* 2021.  That's *Royer* in 2008.  That's

*ATSI* in 2007, and that's *Gilbert* and *Stein*.

        Counsel relies on this citation to crane it for this

proposition that 9(a)(2) cannot be read.  It's not meant to

penalize extensive buying or buying which raises the price of

the security in itself.  But just go one paragraph above that

in the opinion, and what does it say?  That 9(a)(2) was

considered to be the very heart of the act, and its purpose was

to outlaw every device used to persuade the public that

activity into this security is a reflection of a genuine demand

OB7RMASo

1    instead of a mirage.  That's exactly what we've charged here.

2    We've charged Mr. Mashinsky with making the mirage.  But your

3    Honor, obviously, doesn't even need to reach this because at

4    this stage, this is an as-applied challenge.  And we would say

5    it's premature, and it would be denied on that basis alone.

6    Indeed that's what Judge Liman did in *Phillips*.  That's what

7    Judge Subramanian did in *Eisenberg*.

8           And here, this is a good case to do it as well because

9    the factual record at trial would also defeat this.  This would

10   be a very perverse case to be saying that Mr. Mashinsky was not

11   on fair notice.  We have additional manipulative conduct that

12   was alleged in the indictment, including lies, including

13   allegations about the timing of trades to maximum pricing, but

14   also -- so I'd say that's why the as-applied standard exists

15   because the full factual record is not before the Court.

16          Unless the Court has other questions on either of

17   those motions, your Honor, the government rests on its

18   submission.

19          THE COURT:  No, but by the way, the motions *in limine*

20   are not fully briefed.  Is the issue of the bankruptcy at issue

21   on motions *in limine*?

22          MR. DAVIS:  It is, your Honor.  We anticipate -- so I

23   think we both have moved *in limine* on this issue, and so, our

24   response to the defendant's motion is due tomorrow so that is a

25   live issue on the motions *in limine*.

1          MR. MUKASEY:  I think that's right.  I think what I

2    would have said if we argued the surplusage motion, and I

3    understand I probably have the better chance under the motions

4    *in limine* than I do under a surplusage standard to keep this

5    out.

6          THE COURT:  Yes.

7          MR. MUKASEY:  What I would have said is the surplusage

8    is simply a teaser and the main event is coming in the motions

9    *in limine*.  So if you want to punt until then, that's

10   absolutely fine.

11         THE COURT:  I am sure I will deny without prejudice

12   the motion to strike as surplusage because motions to strike as

13   surplusage are not favored in the district, and it's really

14   better made as a motion *in limine* or a motion at trial.

15         MR. MUKASEY:  Say no more.  We are going to brief this

16   extensively, and you'll get it tomorrow in the motions *in*

17   *limine*.  Thanks, your Honor.

18         THE COURT:  Okay.  Thank you.  So subpoenas or

19   depositions or Rule 15.  Defense motion.

20         MR. WESTFAL:  Your Honor, I will be arguing this

21   motion as well.

22         Your Honor, we have moved to preserve the testimony of

23   five material witnesses by taking the deposition of four and

24   serving a subpoena for the appearance of a fifth.  Based on the

25   government's opposition in our reply brief, just to make clear,

OB7RMASo

1    we're no longer seeking the deposition of Mr. Cohen-Pavon in

2    light of the commitment that he will be appearing at trial.  So

3    the witnesses who are left are Daniel Leon, who is a United

4    States citizen living in Israel.  We would move to serve a

5    subpoena requiring his personal appearance at trial, and we're

6    seeking the depositions of Johannes Treutler, who is based in

7    Germany; Ron Sabo, an Israeli citizen whose last known

8    residence is the Netherlands; Yaron Shalem, based in Israel,

9    and Yarden Noy, and attorney also based in Israel.

10          Both sides, I think, largely agree on what courts have

11   considered discretionary factors; factors that will guide the

12   Court's analysis and discretion.  The first being whether the

13   witness is unavailable to testify at trial.  The second being

14   whether the testimony is material, and third whether it's

15   necessary to take the deposition in order to prevent a failure

16   of justice.

17          The government in its opposition --

18          THE COURT:  Could I stop you at the outset?

19          MR. WESTFAL:  Of course, you can.

20          THE COURT:  Among the government's main arguments is

21   it takes a lot of time to get testimony no matter how the

22   testimony is sought, whether it's letters rogatory or even if

23   MLAT was used.  And the motion is essentially a stalking horse

24   for a motion to adjourn the trial.

25          Are you seeking to adjourn the trial?

OB7RMASo

1    MR. WESTFAL:  We are not seeking to adjourn at this

2    time, your Honor.

3    THE COURT:  I read that qualification in the brief,

4    too.  In a way, that weakens your motion, for what it's worth,

5    because it tends to support the government's proposition that

6    the defense knows that it can't get the testimony between now

7    and the beginning of the trial in January.  The trial has been

8    scheduled for January for over a year, and it was set for a

9    long time.  It was an unusually long setting for a variety of

10   reasons, and the defendants could have and should have known

11   about these potential witnesses based upon the indictment,

12   based upon the defendant's knowledge of who these people are,

13   where they are in the hierarchy of the company, where they

14   would have fit in this terms of any arguments of fraud or

15   misrepresentation or market manipulation.

16   So the government essentially says that -- not

17   essentially.  I mean, they say that the motion is simply a

18   device to try to put off the trial and to get further

19   discovery, to get 3500 material before it was otherwise due.

20   Now, your position is somewhat less than clear by saying we're

21   not seeking to adjourn the trial date at this time.

22   I would have thought that, to be perfectly clear,

23   based upon all of the papers, the defendant has a good case to

24   get testimony from abroad but not if it's simply being used to

25   adjourn the trial, and that the testimony is not so critical,

OB7RMASo

1    particularly given the testimony of Cohen-Pavon, that in some

2    way the testimony is so necessary that it has to be granted or

3    that it's a basis to adjourn the trial.

4        So I would have thought that the defense position

5    would be strengthened by a simple statement that based upon

6    attempting to get the testimony of these witnesses, given when

7    we're asking for it, we're not asking to adjourn the trial

8    date.  We'll do everything we can to get these witnesses'

9    testimony.

10        If we don't get these witnesses' testimony, we know we

11    have Cohen-Pavon and perhaps the witness that we're going to,

12    if you let us, Judge, subpoena, because it's a U.S. national,

13    and we want the testimony of the other witnesses at trial.  But

14    we are not seeking an adjournment of the trial date, and we

15    wouldn't seek an adjournment of the trial date simply because

16    these other four witnesses, we've been unable to get.  We know

17    the difficulty of trying to get these witnesses, and we know we

18    could have tried to get these witnesses months and months ago,

19    indeed probably a year ago.

20        So we know the landscape, Judge, but we really want

21    the testimony of these witnesses because we think that their

22    testimony would be material.  But we're not using this as a

23    stalking horse to ask for an adjournment of the trial period.

24    Not we're not asking for an adjournment at this time.  So, your

25    turn.

OB7RMASo

1          MR. MUKASEY:  You can feel free to blame this on me.

2          MR. WESTFAL:  I won't.  I'll take absolute full

3     responsibility for our position, which I'll try to lay out.  I

4     think the first thing we would say is we categorically reject

5     the accusation that this is some underhanded way to seek an

6     adjournment somewhere down the line.  It's never been part of

7     our --

8          THE COURT:  There's a way to answer that.  By not

9     simply saying that it's not part of our strategy; by just

10    saying we're not going to do it.

11         MR. WESTFAL:  So the reason I haven't that, your

12    Honor, is I don't think we can.  And there's a lot to sort of

13    unpack in your question, and so I'm going to try my best to

14    sort of walk through sort of how we got here.

15         I think the first --

16         THE COURT:  It's really not a complex question.  Go

17    ahead.

18         MR. WESTFAL:  I'm intending to respond to sort of the

19    totality of the question.  And the first point, your Honor, is

20    we anticipated and this process has confirmed that the

21    government's view of materiality of foreign witnesses is at

22    such a high bar that it may be impossible to reach.  In order

23    to try to reach that nearly impossible bar, we had to and are

24    still in the process of sifting through millions of pages of

25    documents, WhatsApp messages in Hebrew.  And the idea that we

1    could have said, your Honor, this is the COO of Celsius.  He is

2    a material witness.  Just trust us.  We tried to support our

3    motion and we have.

4              THE COURT:  Yes, you submitted a lot in support of

5    your motion.  The indictment was very detailed.  The position

6    of these people within the corporation was known to the

7    defendant.  The defense was something that——I gleaned from the

8    papers——would have been known to the defendant.  Plus, the

9    critical witness, for purposes of the defense which just, you

10   know, comes out from the paper, is Cohen-Pavon.  And that, of

11   course, was known to the defendant and was really not an issue

12   on the current motion in view of the fact that he is no longer

13   unavailable.

14             So what we're talking about are the remaining four

15   witnesses.  The fifth is subject to subpoena.  Whether that

16   witness will show up in response to a subpoena is another

17   question.  But it's really hard to see why the motion would not

18   have been made earlier on the grounds that you think the

19   government was being too severe on its view of materiality.

20             MR. WESTFAL:  I don't think it's -- I think there's a

21   couple points that we'd like to get across, your Honor.  I

22   think the thrust of the market manipulation charges and the

23   evidence that we put forth to support our motion is that the

24   charge says these hundreds of thousands of CEL token

25   transactions are all his fault.

1            What we've tried to show, your Honor, is that over the

2     course of years, the responsible individuals who made those

3     decisions were not Alex Mashinsky.  It was Johannes Treutler,

4     based in Germany; Ron Sabo; Yaron Shalem; the individuals who

5     we seek their testimony.

6            We couldn't know.  The whole point of the defense is

7     that Mr. Mashinsky, until we got the discovery, we could not

8     know that Roni Cohen-Pavon had told Johannes Treutler in a

9     WhatsApp message, Johannes, get the price to eight.  We

10    couldn't know that until we find it.

11           THE COURT:  Of course.

12           MR. WESTFAL:  And we have to put all of that together,

13    and it takes a lot of time, a lot of time.

14           THE COURT:  Of course, you'll have Cohen-Pavon.

15           MR. WESTFAL:  And we also, your Honor, disagree,

16    respectfully, with the notion that having a cooperating

17    witness, whose testimony will determine the outcome of his

18    sentencing in months or years down the line, that that is

19    sufficient for a defendant who has far more on the line and has

20    other material witnesses who know.

21           THE COURT:  You're mixing two things.  First, is

22    Cohen-Pavon an important witness for you?

23           MR. WESTFAL:  Yes.

24           THE COURT:  Is he subject to you

25    impeachment/cross-examination with if you try to get the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    testimony of the other four, and don't get the testimony of the

2    other four in the somewhat more than two months between now and

3    the date of trial, you will be back in January, as the

4    government suspects, asking for an adjournment because you

5    weren't able to get the testimony of these other witnesses that

6    you asked for but didn't seek their testimony for over a year,

7    which is what essentially the government is arguing.  Do you

8    follow my distinction?

9         MR. WESTFAL:  I think so, and I think our response and

10   I apologize if this is coming off as nonresponsive.  It's not

11   intended to be.  It is just that these are complicated factors

12   in the way I think about things.

13        THE COURT:  It's not so complicated for me really.

14        MR. WESTFAL:  Right.  I think our point is the notion

15   that if we had sought the testimony of these witnesses in

16   September or whatever it is, and I guess I'll point out that we

17   received, I think, another 700,000 pages of discovery just a

18   few months ago.  So it's not as if we got all the discovery we

19   needed, which is how it was presented to your Honor by the

20   government in July, and we've had it for a year.  We received

21   more discovery last week.

22        So the idea that we could have come and said, your

23   Honor, this is Ron Sabo.  He was the head of research.  He was

24   involved in CEL token.  We don't know what he was doing or what

25   his conversations were with Mr. Cohen-Pavon, but we think he's

1   important so we think that meets the materiality test.  I think

2   that would have been rejected out of hand.  Instead we tried

3   and are still trying to understand what the voluminous

4   discovery shows and to try to show your Honor what happened

5   here.

6          We think it's pretty clear what happened here.  We

7   don't feel that it is enough that we have a cooperating witness

8   that we can cross-examine when there are four/five material

9   witnesses, who happen to live outside the United States, who

10  know exactly what happened.

11         THE COURT:  And whose testimony you may never, ever

12  get.

13         MR. WESTFAL:  And all we're asking for, your Honor --

14  there's one more sort of piece of this that I want to loop in.

15  All we're asking for and prioritizing and not trying to jump to

16  an adjournment is the permission that we need.

17         THE COURT:  I know what you're asking for.

18         MR. WESTFAL:  And the adjournment evaluation, I think

19  this is the last piece that has mattered a lot to us and will

20  matter a lot to us in two months.  We expect that all of the

21  exhibits or most of the exhibits we've given to you will be

22  objected to as hearsay.  So it's not just that we don't have

23  the witnesses' testimony.  We don't have these documents that

24  we think show clear as day that the people responsible for what

25  happened with CEL token are them and he literally had nothing

to do with it.  It was not reported to him and in fact was

concealed from him for six months.  No one ever said, Yes,

Mr. Cohen-Pavon could tell me to boost the price of CEL token

secretly in this secret FTX subaccount that no one knew

existed, and we expect that the government is going to say,

That's all hearsay.

On top of that, your Honor we also expect that aside

from Mr. Cohen-Pavon, the government, as we've experienced in

our recent trials in this district, will call as few percipient

witnesses as they can.  And they have a motion pending, which

is we want to get in every WhatsApp email from any Celsius

employee who has ever existed under agency theory.  So the

government will be getting in as many documents and as few

witnesses as possible.  We'll get in zero documents, zero

witnesses who we view quite clearly as knowing exactly what

happened here, but we get to cross-examine Roni Cohen-Pavon.

We don't feel that that meets the test, and in fact,

if that's the situation in two months, we're not sure that that

satisfies due process; for us to not be able to get in

documentary evidence as hearsay and to not be able to call

witnesses to establish our client's defense.  That's our

concern.

THE COURT:  Go ahead.

MR. WESTFAL:  So I think what I'd like to do, and I'd

like to do it in as streamlined a fashion as I can, believe it

OB7RMASo

1    or not, is I'd like to go through each of the proposed

2    deponents and show you really the highlights.  And I can do it

3    in as short a form as possible and show you whatever your

4    Honor's preference is.

5              THE COURT:  I've read the papers, right.

6              MR. WESTFAL:  Understood.

7              THE COURT:  That strikes me as simply reiterating your

8    brief to me.

9              MR. WESTFAL:  No, don't need to do that.

10             THE COURT:  I get your point that these are, from your

11   standpoint, significant witnesses.  Whether they're cumulative

12   to what Cohen-Pavon would ultimately be testifying to, you

13   know, doesn't mean that they're not significant witnesses or

14   that if the other requirements of the rule are met, that's a

15   sufficient reason not to give you the opportunity to attempt to

16   get their testimony if you could.

17             So go ahead.

18             MR. WESTFAL:  So I won't then kind of walk through

19   each of the witnesses recognizing your Honor's familiarity.  I

20   think the last point——and I just want to flip ahead in my

21   notes——is to say the following.

22             THE COURT:  The government says you have no realistic

23   prospect of getting the testimony of these people in the time

24   before trial, somewhat more than two months before trial, and

25   your response to that is what?

OB7RMASo

1          MR. WESTFAL:  I think Judge Cronan in the *Alexandre*

2     case said, It's speculation.  Let us try.  You deserve the

3     opportunity to try.  I think that's all we've asked for is let

4     us try.  The idea that it is kind of beyond the realm of

5     possibility that these individuals would respond to government

6     officials in their countries pursuant to the MLATs that we've

7     provided to your Honor.  I think the MLATs provide a real

8     opportunity to exercise the process.  The problem is we have no

9     ability to utilize the MLATs, and I think may read of the case

10    law is that judges aren't going to order the government --

11         THE COURT:  I believe the First Circuit has said that

12    a judge lacks the power to order the government to use the MLAT

13    because the MLAT is designed to be used by the government.  It

14    doesn't mean that the government couldn't do it but that the

15    Court has no power to order the government to do that.

16         MR. WESTFAL:  I think that's our read and we agree

17    with that, but the MLAT process is available in each of these

18    three countries.  And again, our priority at this moment is

19    simply getting the Court's permission to try, and if the

20    government chooses not to utilize the tools at its

21    disposal——again, I think it was Judge Cronan who said that——I

22    don't think the government needs to be heard then to complain

23    about delays, et cetera.  There's certainly no prejudice that

24    the government has spoken to, and Judge Sullivan talked about

25    in the *Epskamp* case.  He said, yes, a delay, it happens.  But

OB7RMASo

1    unless the government has presented your Honor with the manner

2    in which they'd by prejudiced, which they have not, I don't

3    think there's more that needs to be said other than the

4    government thinks there's a low chance of us getting it, and

5    they can choose or not to choose to help us with the process of

6    obtaining the testimony of these four witnesses.  Without more,

7    it's hard to justify denying Mr. Mashinsky this relief because

8    the government doesn't offer any relief if it's granted.

9            MR. MUKASEY:  Judge, may I have one moment, please?

10            THE COURT:  Sure.

11            (Counsel conferred)

12            MR. WESTFAL:  Thank you, your Honor.

13            Just trying to think through the process that if your

14    Honor were to grant the motion and we either, with the

15    government's assistance, went through the MLAT process or the

16    letters rogatory process, and in a couple times month there's

17    been zero traction; we've heard nothing; there's no prospect,

18    then we wouldn't seek an adjournment because there's no

19    prospect, and we're a couple weeks before trial.  If we were

20    able to go through the process and there's engagement from

21    Germany, Israel, the Netherlands and things are being

22    scheduled, we certainly do reserve or would like to reserve the

23    ability to seek an adjournment.  Because, in our view, the

24    possibility of a delay is so clearly outweighed by our client's

25    interest in putting on a defense in a fair trial and the

OB7RMASo

1    consequences that the government has made clear he may be

2    facing here.

3         THE COURT:  Well, we're making progress.  We've gotten

4    to the point where if I granted the motion and we're in

5    January, shortly before trial, and there's no discernible

6    prospect that the additional witnesses are about to be able to

7    be deposed, you wouldn't be seeking an adjournment on that

8    basis.  That's progress.

9         MR. WESTFAL:  I think it's hard -- you know, I'm not

10   great at predicting and knowing exactly what the next move is.

11   That's sort of where I'm coming from.

12        THE COURT:  It would be so simple, really, to simply

13   say that we're not using the motion as a basis for delay.  We

14   think it's important to grant the motion.  If we're not able to

15   get these people by now, taking everything into account,

16   including when this motion was made, what the basis for the

17   motion is, we're not going to use this as a means to adjourn

18   the trial, which has been scheduled for a long time and which

19   would require a great deal of pretrial preparation on behalf of

20   both the government and the defense.  We're not going to be

21   back to you in January saying you know, the government

22   predicted we could never get these depositions in the somewhat

23   more than the two months that we've asked for them, and the

24   government was right.  So we're not going to use the motion,

25   and, Judge, your gracious grant of the motion, as a basis to

OB7RMASo

1    adjourn the trial.  We're not going to do that.  We're not

2    going to give credence to the government's argument that we

3    just made this motion knowing that we couldn't get these people

4    in the somewhat more than two months.  We're not going to do

5    that.  You've made some progress but not all the way.

6         MR. WESTFAL:  I think, your Honor, you've stated our

7    view.  I do want to go back to something I said, now I think a

8    few minutes ago, which is we do categorically reject the

9    allegation that this is being used to adjourn the trial.

10   That's not why we're doing this, and we hope that our papers

11   have shown that to you, that there is quite clearly a

12   substantive reason that these are material witnesses.

13        We fully recognize, your Honor, the issues of timing

14   and the issues of delay.  We're not blind to those, but our

15   priority at this moment is to get permission from your Honor.

16   And I guess the last point I make on the MLAT process is:  The

17   government states that the MLAT process can't be used for

18   "defense depositions."  We disagree with that.  The MLATs that

19   are before the Court make no mention of defense depositions or

20   government depositions.

21        In the *Coburn* case in New Jersey, that I believe

22   Mr. Davis mentioned a few minutes ago, the government made the

23   same representation.  We can't use the MLAT to seek defense

24   depositions, and then a few months later, that's exactly what

25   they did.  They used the MLAT process.  So we do take issue

OB7RMASo

1    with the idea that the MLATs can't be used, but we're just, as

2    I stated previously, are not in a position to force the

3    government to join us.

4            THE COURT:  Okay.  Anything else?

5            MR. WESTFAL:  I'll check my notes, your Honor.

6            THE COURT:  Do you want to respond at all to the

7    government's argument that it's an essential part of the

8    defense application to show that the witnesses would be

9    available for their deposition, that they would show up?

10           MR. WESTFAL:  We do.  That was actually the first

11   point I had in my planned remarks, your Honor.  We certainly

12   disagree, and we disagree on sort of a number of bases.  I

13   think the simplest basis is the language of Rule 15, and that's

14   what Judge Sullivan pointed in the *Vilar* case.  The drafters,

15   the advisory committee, made very clear in Rule 15 that

16   deponents have to consent to depositions if they are a

17   defendant.  When the committee drafted in that way, we don't

18   see it as a correct interpretation of the rule for the

19   government to say actually it's not just defendants, it's every

20   deponent that they have to consent there's a voluntary

21   appearance requirement.  That's just simply just not what the

22   rule says.

23           THE COURT:  What do you do with the Second Circuit's

24   comment in *Whiting*?

25           MR. WESTFAL:  So certainly a tricky one.  *Whiting* was

OB7RMASo

1    decided, I think, 62 years.  For the next 62 years, we haven't

2    found a court that has made mention of that being a requirement

3    under the rule until Judge Furman just a couple months ago.

4    And that includes several Second Circuit cases that we've

5    cited, including the *Cohen* case from 2001, the *John Polk* case,

6    and the *Celine* case.  And we would note that not only does the

7    rule not say what *Whiting* and Judge Furman has said, but no

8    case in the 62 years in between has said it either.

9            If your Honor were to agree with Judge Furman, we're

10   sort of stuck there, right.  I mean, there's nothing we can

11   certainly do about it.  We just disagree with the language

12   of -- based on the language of the rule and the overwhelming

13   body of case law in between.  And we cited to your Honor, I

14   think, the *Alexandre* case and the *Grossman* case, which are

15   analogous situations where the defendant was, in the Grossman

16   case, dealing with a deponent in Canada, who counsel was

17   speaking with for months, and suddenly dropped off the face of

18   the earth.

19           Judge Stein made no mention of a voluntary appearance

20   requirement and granted the Rule 15 application, and Judge

21   Cronan did the same thing in *Alexandre* with crypto companies

22   based in Estonia and Cyprus, I believe.  So that's our position

23   on *Whiting*.

24           THE COURT:  Okay.  Thank you.

25           MR. WESTFAL:  Thank you, your Honor.

OB7RMASo

1          THE COURT:  Government?

2          MR. HOBSON:  Your Honor, I'll be brief, but I did want

3    to respond to some of these points.

4          First, on the MLAT point, we've discussed this with

5    the Office of International Affairs at the Department of

6    Justice.  They have informed us that for Germany and

7    Netherlands, the MLAT would not be available here because those

8    countries or our obligations with those countries require that

9    it be in furtherance of a government case, and they view these

10   requests here as not in furtherance of the government's case.

11   So we've been told that it would not be available to us there.

12         We've been told it would be available to us in Israel,

13   but that it would take months and months to succeed in getting

14   an answer on the MLAT.  We're told in Israel the fastest

15   they've seen an MLAT answered is two months, but they

16   emphasized to us that that is the fastest and it's generally in

17   very urgent and pressing situations.  They've also emphasized

18   to us that political affairs can sometimes complicate it.  In

19   other words, how busy the Israeli government is with other

20   things can complicate how long it takes them to act on MLAT,

21   and OIA felt that the particular geopolitical situation at this

22   time would qualify as a busy time for the Israeli government.

23   That's why we don't think there's any foreseeable chance of

24   getting this done in the near future.

25         I also want to emphasize that even engaging the

OB7RMASo

machinery is a tremendous amount of work and expense both for

our team, for OIA, and for the foreign courts that would have

to be involved.  On the other side of the ledger here --

THE COURT:  That argument is not, frankly, terribly

persuasive to me.

MR. HOBSON:  I understand, your Honor.

THE COURT:  The government does not have unlimited

resources but the government has sufficient resources to have

an attorney work on attempting to get testimony from four

witnesses.

MR. HOBSON:  The point is, I think the daily work on

that might be more than the Court might appreciate.  I

understand it is not the driving concern.  It is a concern that

the case law says is relevant, so I'm raising it.  I think

there are bigger concerns here.

THE COURT:  And with respect to whether the witnesses

are part of the government's case, witnesses are being sought

by the defense and the defense wants their testimony.  But I

assume from the government's papers, the government says these

people might not want to testify because they were participants

in a conspiracy, which would make them part of the government

case.

MR. HOBSON:  I understand, your Honor.  I can tell you

I raised those arguments to OIA, and I was told that they would

not work for the Germany and Netherlands MLATs.  I have to rely

OB7RMASo

1    on them there.  I'm only saying what I was told.

2            THE COURT:  Why would that be true though?

3            MR. HOBSON:  Because it's in furtherance of the

4    defense case, in this case, the depositions themselves.

5            THE COURT:  I know that.  I know that, but it would

6    seem to me the government has to be completely honest with the

7    process.  But based upon the allegations in the government's

8    papers, these people, if they were prepared to testify, the

9    government says they would be government witnesses.  And if

10   that's true, they could then be sought under MLAT, right?

11           MR. HOBSON:  I don't think we said they would be

12   government witnesses.

13           THE COURT:  Because the government says they were

14   participants in a conspiracy and might be asserting their Fifth

15   Amendment privilege, which means that they would be——putting

16   aside the Fifth Amendment privilege——according to the

17   government, material witnesses for the government, not the

18   defense.  They would be supporting a government theory of a

19   criminal conspiracy.

20           MR. HOBSON:  And potentially subjects of the larger

21   investigation as well.  I believe the OIA's point was that in

22   our duty of candor to the foreign countries here, we would have

23   to note that this was a result of the requests that these

24   witnesses be called for the defense case, and that because of

25   having to disclose that fact, it would not be granted.

OB7RMASo

1        I am limited in my knowledge there.  But we also

2   understand that regardless, it would be a process of several

3   months that they've had -- each of those countries has had one

4   recent experience with the MLAT for the government testimony

5   for a government witness, and it took many months and was very

6   difficult to arrange and could not foreseeably be done on this

7   timeframe.

8        The *Whiting* point on this threshold inquiry of whether

9   a witness is willing to testify sort of goes hand in hand with

10  this because it's sort of asking:  What is all this worth in

11  the end, and if the expectation is that no one is going to

12  testify or is going to assert the Fifth Amendment, then what is

13  it all really worth?  As far as we know*, Whiting* is still good

14  law.  It's still being cited by the Second Circuit ever since

15  it came down.  It was cited recently by Judge Furman and

16  *Ramirez*, as the Court noted.

17       I think the reason that you don't see the specific

18  instance of a party deponent or a party witness declining to be

19  deposed is that the normal situation, a party is proposing the

20  foreign deposition of the witness who it has been working with,

21  who is a party witness, who has met with the proponent of the

22  testimony, who often has sworn out an affidavit about what they

23  would say, has at least made specific representations to the

24  defense attorney or the government attorney, depending on what

25  the party is, about what that witness would say so that the

OB7RMASo

1    attorneys can make specific representations.

2           We don't have that here.  I think that's what makes

3    this a very difficult case to evaluate on materiality.  Because

4    we have speculation about what -- about topics that these

5    witnesses would know about, but we have no indication from

6    defense counsel about what they think they are going to say

7    because the only thing these witnesses said they would say is

8    nothing.

9           THE COURT:  Well, the defense relies upon the

10   documentary evidence about what these witnesses allegedly did

11   at the time.  Before we get into that, before we leave *Whiting*,

12   you said quickly that it's been followed by the Second Circuit.

13          MR. HOBSON:  I said the Second Circuit has continued

14   to cite *Whiting* in general, not for the specific proposition

15   but for its overall holdings about Rule 15 and the standard.

16          THE COURT:  What cases has the court of appeals cited

17   *Whiting* in?

18          MR. HOBSON:  Let me look in my notes and see if I have

19   it here.  I can certainly get it for the Court.  When you read

20   Second Circuit decisions on Rule 15, *Whiting* is often among the

21   cases it has cited.

22          THE COURT:  Okay.  On the issue that there must be an

23   indication of the witness's willingness to testify, with

24   respect to that comment in *Whiting*, wasn't that dicta?

25          MR. HOBSON:  No.  I don't believe so, your Honor.

OB7RMASo

1          THE COURT:  The holding in *Whiting* didn't depend upon

2     the fact that there was no indication that the witness had

3     indicated a willingness to testify.  Ultimately what the court

4     of appeals said was:  It was not an abuse of discretion for the

5     district court to have denied the Rule 15 request because in

6     the first instance, the request was denied by the district

7     court because it was vague and speculative.  And in the second

8     instance, it was denied because it was too close to trial, and

9     therefore, in neither case was it abuse of discretion.  So the

10    court of appeals did not hold that it was proper to deny the

11    request because the requester had not shown that the witness

12    was willing to testify.

13         MR. HOBSON:  Your Honor, I don't believe they -- I

14    don't believe the witness there had been -- I don't believe the

15    deponent had shown that the witness was willing to testify in

16    that case.

17         THE COURT:  But the court of appeals didn't base its

18    holding on the fact that there was no evidence that the witness

19    had agreed to testify.  The court of appeals said here are the

20    requirements for Rule 15, and then said that what was

21    represented was vague and speculative in the first instance,

22    and second, too close to trial in the second instance.

23         MR. HOBSON:  Your Honor, I think that's slicing it

24    pretty thin when the court in *Whiting* was pretty clear that one

25    of the things you had to show was that the witness was willing

OB7RMASo

```
 1    to testify.  That's something that not only did Judge Furman
 2    reaffirm that recently, but Judge Kaplan in the Chusid decision
 3    relied on the fact that the witnesses there weren't willing to
 4    testify.
 5              THE COURT:  Judge Furman denied the request also on
 6    the grounds that it was made on the eve of trial.
 7              MR. HOBSON:  Your Honor --
 8              THE COURT:  And plainly, what was said in Whiting has
 9    been not followed by other judges in this district.
10              MR. HOBSON:  Your Honor, the only example I'm aware of
11    is the Judge Sullivan opinion; is that correct?  And I don't
12    believe Judge Sullivan addressed Whiting there, and he said
13    there was no case law on point.
14              THE COURT:  So he just missed it?
15              MR. HOBSON:  Your Honor, I don't know.  But the
16    opinion did not address Whiting when dealing with that issue,
17    and Judge Furman noted that in his decision.  I think
18    regardless of whether we treat this as a threshold issue or an
19    important issue to be considered, the case law is clear that
20    you are supposed to consider things like whether this is likely
21    to lead to admissible testimony.  And if a witness has said
22    that they will not testify, then that by definition is not
23    likely to lead to admissible testimony and does make it worth
24    going to all this effort and expense to go down this road.
25              THE COURT:  Go ahead.
```

OB7RMASo

1          MR. HOBSON:  I do want to push back on the idea that

2     they have met the materiality standard here.  I think they're

3     very much treating it as a relevance standard, and that is not

4     the law in this circuit.  They said the government is pressing

5     a high standard.  The standard we're pressing is the one that

6     the Second Circuit has enunciated, which is some showing behind

7     unsubstantiated speculation that the evidence exculpates the

8     defendant; that it has to be highly relevant to a case.  That's

9     the *Vilar* case.

10          THE COURT:  I'm sorry, *Vilar*?

11          MR. HOBSON:  *Vilar*, the Judge Sullivan decision.

12          THE COURT:  I was going to say it's not the Second

13     Circuit.  It's the district court.

14          MR. HOBSON:  I know, your Honor.  The *Kelley* case is

15     the Second Circuit case that we had cited.  I'm citing other

16     cases now, the *Vilar* decision, which said it was highly

17     relevant to a central issue in a case.  That's quoting the

18     *Grossman* decision.

19          THE COURT:  And Judge Sullivan granted it.

20          MR. HOBSON:  For two witnesses, and he denied it for

21     two.  And he denied it for two because there were not

22     particular enough allegations about what the witnesses would

23     say and why it would be, in that case, inculpatory, I believe,

24     because they were government witnesses.

25          THE COURT:  Go ahead.

OB7RMASo

1          MR. HOBSON:  Judge Kaplan has said it has to be more

2     than merely relevant.  I think that's an important standard

3     here.  We don't deny that these witnesses, who were at the

4     company, who were involved in some of the relevant transactions

5     would meet the standard for a deposition in civil discovery,

6     but here you have to show what they would say and why what they

7     would say would be exculpatory.  Here, there's no reason to

8     think they would say, We didn't tell Mashinsky about our

9     illegal actions.  It is, we would submit, more likely they

10    would say, We did tell Mashinsky.

11         THE COURT:  I thought that the standard was somewhat

12    less than exculpatory, that it was something like materiality.

13         MR. HOBSON:  I think Judge Kaplan sort of grappled

14    with this *Abu Ghayth* decision where he says, It need not be

15    definitive proof of guilt or innocence, but the testimony

16    should be more than merely relevant.  And then, the *Pham* case

17    says that the testimony should challenge central aspects of the

18    government's allegations.  So it doesn't have to be proof of

19    innocence, but we have to know what these witnesses are going

20    to say that would actually tend to disprove the government's

21    case.

22         THE COURT:  The defendant has made some particularized

23    allegations based on the documents that the witnesses would

24    testify in ways that are directly inconsistent with some of the

25    allegations in the indictment about what the defendant was

OB7RMASo

1    allegedly telling the other people in the company to do as to

2    whether to purchase or sell CEL.  And the response by the

3    government is, yes, those may appear to be inconsistent, but

4    they are not really inconsistent because the instructions were

5    being given at different times as to whether to purchase or

6    sell.  But the allegations from the documents are at least

7    significant in terms of challenging some basic allegations in

8    the indictment.  And the defense has made particularized

9    allegations, and the government has only briefly responded to

10   them in saying there's nothing inconsistent because this was

11   going on at different times in 2020 and 2021.

12           MR. HOBSON:  Your Honor, our argument——and our

13   allegations in the indictment——is that this was an ongoing

14   price manipulation scheme by Mashinsky and that sometimes he

15   was dialing the buying up when he needed to go high, and when

16   it got too high, would he dial it down.  And so, it is a

17   continuous process of manipulating the price.  The fact that

18   sometimes he said buy and sometimes he said sell is not

19   inconsistent with that.  What's missing from the defendant's

20   arguments here are any indication that these witnesses are

21   going to say I wasn't discussing this with Mashinsky.  And our

22   understanding from meeting with Cohen-Pavon, meeting with other

23   witnesses, is the witnesses were going to say they were being

24   instructed by Mashinsky to do and that they did know about it.

25   It's their burden to show that these witnesses would say

OB7RMASo

1    otherwise.  They haven't met that burden here.

2              THE COURT:  All right.  Go ahead.

3              MR. HOBSON:  Your Honor, with that I'll rest on our

4    papers unless the Court has more specific questions for me.

5              THE COURT:  No, I think that's it.

6              MR. WESTFAL:  Your Honor, could I respond just to that

7    last point?

8              THE COURT:  Sure.

9              MR. WESTFAL:  Thank you.  I think we noted in our

10   papers and I'm not going to go through every witness, but I'll

11   go through one on this last point that Mr. Hobson made.  The

12   government in their papers said, We've interviewed both

13   Cohen-Pavon and Treutler and can confirm that each witness has

14   stated in substance and in part that they were instructed by

15   Mashinsky to purchase excess CEL tokens to support the price of

16   CEL.  It's a representation from the government with no

17   evidentiary proof.

18             In our reply, we provided, in the papers as well as on

19   video, the following, and I'll summarize from Mr. Treutler:

20   "Q.  (By the FBI):  Did Mr. Mashinsky ever instruct you to

21   support the price and make the market look strong by

22   eliminating sellers from the order book?

23   "A.  No.

24   "Q.  Did Alex ever ask you or direct you to make the market

25   look stronger by doing purchases in the market?

OB7RMASo

1    "A.  I mean, he didn't ask me to do any purchases.

2    "Q.  How did Alex want to enable using CEL token as collateral?

3    Was it by making the market for CEL token to be stronger?

4    "A.  No.  He wanted a lot of use cases for the token."

5         You have that evidence before you.  It is -- I don't

6    know under what standard that couldn't be material.

7         THE COURT:  All right.  Okay.  I've listened to the

8    parties, and I'll have a more extensive decision with respect

9    to the issue of the depositions and the issue of the motions to

10    dismiss, but I don't want to be responsible for any delay.  So

11    briefly, with respect to the application for preserving

12    testimony under Federal Rule of Criminal Procedure 15, a Court

13    may order the deposition of a witness to preserve testimony for

14    trial where there are exceptional circumstances and in the

15    interest of justice.

16         To establish exceptional circumstances under Rule 15,

17    the movant must show:

18         "(1) the prospect witness is unavailable for trial;

19         (2) the witness's testimony is material; and

20         (3) the testimony is necessary to prevent a failure of

21    justice."  *United States v. Cohen*, 260 F.3d 68, 78, Second

22    Circuit 2001.

23         After considering all of the papers and the argument

24    of the parties, the defendant's motion to preserve the

25    testimony of material witnesses residing outside the United

OB7RMASo

States is denied as moot as to Cohen-Pavon and granted as to

Treutler, Sabo, Shalem and Noy.  Further, the defendant's

request pursuant to 18 U.S.C. Section 1783 to serve a subpoena

requiring Leon to appear at trial is granted.

The Court orders that the depositions be recorded by

video, to the extent that they are taken by deposition, to

allow for presentation to the jury in a manner that would

replace in-trial testimony.  The parties are directed to confer

and work in good faith to identify appropriate next steps

including to arrange for the depositions to occur as soon as

possible.  See *United States v. Fargesen,* 21-Cr.-602, 2022 WL

4110303 at 5, Southern District of New York, September 8, 2022.

While not directing the government to take any

specific actions, the Court asks the government to consider

using MLATs, or other processes, for seeking international

assistance that might expedite the necessary coordination with

Dutch, German, and Israeli officials.  See *United States v.*

*McLellan,* 959 F.3d 442, 476, First Circuit 2020.  As the Court

indicated at argument, while the Court finds that the defense

has made a sufficient showing to try to get the testimony of

these witnesses, the defense has not shown any basis for the

adjournment of the trial if that testimony is not obtained, and

the defense has said that it is not seeking an adjournment of

the trial at this time.  The clerk is respectfully directed to

close ECF No. 68.  A more extensive opinion will follow

OB7RMASo

1    shortly.

2           As to the motion to dismiss Counts Two and Six, again,

3    a more complete will follow soon.  But the defendant's motion

4    to dismiss Counts Two and Six of the indictment is denied, and

5    the defendant's motion to strike surplusage is denied without

6    prejudice.  So ordered.

7           I should have the opinions out for you quite early

8    next week.  Anything else?

9           MR. DAVIS:  No, your Honor.  Thank you.

10          MR. MUKASEY:  No, Judge.  Thank you.

11          (Adjourned)

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25